## Evans's Appeal.   Kuhn's Appeal.

1. As a general rule a constructive trust as to personal rights may be asserted at any time within six years after the knowledge of the facts creating it.

2. Such trust is barred after six years, but laches for a shorter period, aided by other circumstances, will bar the right.

3. Plaintiffs filed a bill alleging that they and defendants were associated in the formation of a company; that defendants purchased lands and sold them to the corporation at a price much beyond cost, concealing the price paid, and thereby a resulting trust arose, and praying for payment of the profit, &c.   Under the circumstances in the case the bill was dismissed on account of laches in filing it four and one-half years after knowledge of the facts.

4. The bill was by plaintiffs, " and all other stockholders," &c. ; the relief prayed for was that defendants should pay to the corporation.   This was to obtain relief through the equitable rights of the corporation, and required a consideration of the knowledge and conduct of the corporation.

5. The land was conveyed to the corporation April 8th 1863 ; the bill was filed March 19th 1870 ; the minutes of the same April showed the facts which were the ground of the complaint.   Nothing was done to establish a constructive trust.   In October next the company authorized a loan, to prevent which nothing was done.   *Held*, that the plaintiff thereby acquiesced in it.

6. Money was borrowed, judgments were obtained against the company, and all their property sold and bought in for the creditors.   These new business arrangements having intervened after the plaintiffs had knowledge, their delay was unreasonable and was fatal to the bill.

7. Although the transaction was originally voidable, the acquiescence for less than six years of those who might have avoided it having induced the offending parties to believe that it was not to be questioned, barred the plaintiff.

8. Two stockholders who became plaintiffs by amendment more than six years after their knowledge, are to be considered as if they had filed an original bill when they asked to come in as plaintiffs.

9. Ashhurst's Appeal, 10 P. F. Smith 290, followed.

March 1st 1876. Before SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the court at Nisi Prius, No. 56, to January Term 1870.   In Equity.

The bill in this case was filed March 19th 1870, by Manlius G. Evans and Hartman Kuhn, against Charles L. Borie, Henry P. Borie, Edward V. Maitland, Charles Wister, Samuel Wood, Edward M. Hopkins, Charles P. Bayard, Edward T. Shaw, Joseph C. Harris, William Harris, John P. Bell, Ezra Bowen, George S. Fox, Camille D'Invilliers and the Keystone Zinc Company.

On the 9th of September 1870, an amendment to the bill was filed.   On the 13th of December all the defendants except Wood, Shaw and William Harris filed answers.   On the 16th of December, a replication was filed.   Testimony was taken in the cause until June 15th 1872, and on the 1st of July and the 24th of October 1872, respectively, Charles Wells and H. F. Kenney on their petitions were allowed to become plaintiffs in the cause.   On

the 11th of January 1873, on affidavit of plaintiffs an amendment was made, allowing the plaintiffs to add the names of Adolph E. Borie, George Trotter, George T. Lewis and Nathan Bartlett as defendants.

The answers of Adolph E. Borie, George T. Lewis and George Trotter were filed on the 30th of January, on the 10th of February and the 17th of May 1873, respectively.

On the 2d of October 1873, Edward Olmstead, Esq., was appointed master. His report set out the bill and answers much at large.

The bill, which was on behalf of the plaintiffs and such other stockholders of the Keystone Zinc Company as should come in and contribute, &c., was substantially as follows :—

On the 9th of May 1854, Charles Wister and others, their associates and assigns, were incorporated by the name of the Keystone Zinc Company, for mining zinc ore, and manufacturing and selling zinc paint in the counties of Northampton and Lehigh.

In March 1864, the defendants formed the design of making profit from land in Blair county of which they had heard, as containing zinc ore ; and they announced that they had secured lands containing zinc ore and were forming a company to develop them ; the capital stock to consist of two hundred thousand shares at $5 per share.

In consequence of these representations, about March 24th 1864, Evans, plaintiff, took one thousand shares and paid $5000 for them, believing that he thus became an original subscriber ; at the filing of the bill he still owned three hundred shares. Kuhn, plaintiff, took six thousand shares and paid $30,000 for them, believing the stock belonged to the company and the purchase-money would go into their treasury ; he still held all the stock.

Kuhn took no receipt, but Evans and others who subscribed for stock, took a receipt in the following form :—

" Received of          dollars, in full, for a subscription to          shares of stock in a company to be hereafter organized, under the title of the Keystone Zinc Company, with a capital of one million of dollars, divided into two hundred thousand shares, at five dollars each."

Subsequently certificates for the number of shares subscribed for by the plaintiffs were received by them.

Large sums of money were thus received by the defendants on these representations for stock ; this money was in part paid to the owners of the land and the remainder appropriated to the defendants' own use and never entered on the books of the company. Whilst taking measures to obtain these moneys, the defendants were negotiating for the land and taking measures to secure them for the company which they were organizing. On the day Kuhn paid for his stock, C. L. Borie, acting for the defendants, obtained from Lewis, one of the defendants, a contract to convey to him,

Borie, two tracts of land in Blair county, containing together 186 acres, for $100,000. On the next day, C. L. and H. P. Borie, defendants, obtained from H. B. and G. N. Tatham a contract to convey certain leaseholds in the same county for $50,000; these were also secured for the company by the two Bories with the intention of vesting the title in the company. The plaintiffs averred that all the defendants were jointly concerned in the common object of endeavoring to make an illegal profit by buying lands for a company which they were forming at one price and selling to the company at a higher one. At the same time the defendants were engaged in obtaining a charter and organizing under it. On March 28th 1864 there was enacted an act supplementary to Act of 1854 before mentioned, extending its provisions to Blair county. The company was organized by a meeting of Charles Wister and two others of the corporators named in the Act of 1854; at this meeting a book for subscriptions for stock was opened and subscriptions were made by several of the defendants; before any money had been paid to the company for stock or a conveyance made to them and without notice to the plaintiffs and others to whom stock had been sold, C. P. Bayard was elected president, C. L. Borie, treasurer, H. P. Borie, G. S. Fox, E. V. Maitland, J. P. Bell and Charles Wister, directors. The defendants were affected with a fiduciary relation to those whose money was thus obtained and were bound to pay for any stock which they took, and to put all the money which they received for stock into the company's treasury, and to buy the lands at the lowest prices without any profit to themselves, and every right and interest in the land bought from Lewis and the Tathams belonged to the company.

On the morning of the 8th of April 1864, the day after the land had been paid for by defendants and the title made to C. L. Borie, they procured a meeting of the directors, who resolved to buy the land from C. L. Borie for $200,000; they afterwards procured another meeting in the afternoon of the same day, at which they rescinded this resolution and passed one to pay Borie for the land by one hundred and ninety thousand shares of stock at the par value of $5 per share, that being the entire stock of the company except ten thousand shares.

These one hundred and ninety thousand shares, or the money raised by the sale of them, were divided among the defendants. This resolution actually passed to Borie and the defendants the cash proceeds of shares already sold, which were far more than all that had been paid for the land; and also the unsold shares, if any, to fill up the one hundred and ninety thousand shares. The sum actually paid for the land was $200,000.

The defendants owned or controlled a majority of the stock of the company, and some of them were its directors and officers, and neglected and refused to take measures or to permit the company

to take any measures against themselves for the purpose of granting the relief the plaintiffs prayed for; and that, therefore, no relief through the intervention of the company could be obtained.

The plaintiffs prayed:—

1. That the defendants might be compelled, by the decree of this court, to pay into the treasury of the company $5 per share for each of said one hundred and ninety thousand shares of said stock so allotted or transferred by resolution of April 8th 1864, to defendants, or to Borie for them, with interest, deducting the sums actually bonâ fide paid for the lands so acquired for said company.

2. Or, if the court shall be of opinion that such a decree is more consonant with equity, might compel defendants to pay into the treasury of the company, with interest, all sums received by them or any of them from sales of said one hundred and ninety thousand shares, or any part of them, less what they paid for said lands, and might surrender all of said one hundred and ninety thousand shares which they have not so sold.

3. That if such a course be necessary in order to enable the court to reach such a decree, or prepare the way therefor, the company might be compelled to take such steps, and commence such proceedings against said defendants as may be or become proper or necessary for the purpose of enforcing against them the redress sought by this bill.

4. Further relief.

The bill asked for relief by reason of a trust arising by implication of law, more than five years before filing the bill; the plaintiffs were therefore barred by the 6th section of the Act of April 22d 1856.

The individual defendants answered.

Lewis was the owner of the farm in Blair county, and had also an interest (with one Taylor) to the extent of one-half in the Tatham leasehold.

For at least a year before March 1864, Lewis had been speaking to C. L. Borie and Hopkins, and had made many representations as to its value. Wister also had endeavored to induce his co-defendants to unite with him in purchasing the lands of Lewis, the inducements being its intrinsic value, and the certainty of being able to sell at an advance; no determination had been reached as to the mode of turning it to profit. On March 1st 1864, Wister procured from Lewis a contract to sell his farm in Blair county to C. L. Borie, Hopkins and Wister, the price being $100,000, with an option for a month to buy or refuse; the contract was secured by Wister without consultation with the others, his object being to secure for himself power to participate in the purchase. Whilst these three had this option, Tatham asked Borie to unite in forming a company with leasehold property held by them; Borie said

he and his associates thought of doing that with the Lewis property, and suggested to Tatham to join both properties in one company ; the Tathams were informed that the Lewis property would be put in at $100,000, the Tatham at $50,000, two-thirds of the stock to belong to the owners of the Lewis land, and one-third to the owners of the Tatham land. Tathams declined this, but gave Borie by writing an option till April 1st to buy their property at $50,000. On the 24th of March Wister urged Borie to close with Lewis, assuring Borie that he, Lewis, could immediately resell at a profit. C. L. Borie, for himself and Henry Borie, said he would sell at $200,000, which would yield $50,000 profit, the Tatham property to be included, though no reference had been made to that property, Wister believing from inquiries that he could at that price find purchasers, they intending to form a company, the land to be converted into stock. This was the only proposal made to these defendants, and on this they consented to join. Borie, at Wister's request, drew a paper to be signed by persons entering into the project ; it was as follows :—

" We, the undersigned, hereby agree to pay to Mr. Charles Wister or his assigns the sums opposite to our names, or a pro ratâ proportion of the same towards the purchase of the zinc property in Blair county, embracing the entire interest of Mr. G. T. Lewis in a farm or farms containing two hundred acres of ground, more or less, certificates of stock to be issued to us as soon as the company can be organized ; cash to be paid on execution of the deed in the name of such party as we may agree upon for a sum not exceeding $200,000."

Borie then bought the property from Lewis.

C. L. Borie had expected that the $100,000 would purchase Lewis's interest in the leasehold as well as his farm, but Lewis declined and. required that he should be paid for his leasehold interest as much as the Tathams were to receive ; this interest had not previously been referred to, and Borie had no right to agree for the others. He entered into a contract for this interest for himself and H. Borie, intending the others take it if they chose. Wister procured signatures to the paper to the extent of $130,000, but it was not deemed by any that there was a binding contract, both because there were but $130,000 subscribed ; and the contract was but verbal with Borie, although he had contracted in writing with Lewis. Borie was then unwilling to sell unless the new interest in the leasehold was included, and the price increased to $250,000 ; of this Wister and others who had signed the paper were informed. There was then no binding contract affecting the title bought by Borie from Lewis, except Wister and Hopkins, nor any supposition then that Borie could not vary his offer. One of the signers to the paper proposed that they should give the Bories and their associates forty thousand shares of stock in the company

intended to be organized, in addition to the cash price they had agreed to pay. This being agreed to by Borie, he, on behalf of his firm and others who had authorized him to do so, subscribed enough to make up the $200,000 and to form a corporation, the capital of which was to be the land and the stock to be issued to the owners of the property, in the proportion of their interests. There were then added to the paper the names of the several persons on whose behalf Borie undertook to sign, and the whole amount of $200,000 filled, by subscriptions in sums of $20,000, $10,000 and $7500. The names of all the original individual defendants, except Woods, were to the paper, and also the names of A. E. Borie, Trotter, Lewis and Bartlett, afterwards brought in as defendants. At this time no one was interested but those who had signed the paper, and none of those who had originally signed were bound, because of the change after they had signed; but on the same day they ratified the change. None of them supposed that the Bories, Wister or Hopkins had been their agents. They were then under no obligation to apply for a charter, and when they obtained it none were included but those whom the grantees of the franchises admitted as associates; and, therefore, when the corporation was formed it was bound by the terms of the purchase, which had been settled before the contract was applied for. When the Bories, Wister and Hopkins agreed to sell to those about to form a corporation, there was a refusal at the cost, and a demand for an advance, which was accepted. There was then no power in anybody to require the purchasers to sell on any terms, and no pretence that they acted as agent for any one. Those who bought and agreed to convey to the corporation, agreed subsequently amongst themselves to contribute ten thousand shares, to be sold and the proceeds paid to the company for working capital. The organizers of the company agreed to pay for the land $200,000 and forty thousand shares. One hundred and sixty thousand shares were received by the owners of the property as the price of giving it to the corporation, and they sold ten thousand shares of the one hundred and sixty thousand, and gave the proceeds to the corporation as working capital. Forty thousand of the one hundred and fifty thousand remaining, were sold to reimburse the cash paid for the property. One hundred thousand shares, more than a year afterwards, were distributed amongst the owners in proportion to their rights. The larger portion of these shares was still owned by these parties. Twenty-eight thousand shares were sold more than a year after the company was organized at the then market price; and it is impossible for any one claiming in the right of the corporation to demand, as the property of the corporation, the difference between the cost of the property and the amount realized by the purchasers out of their stock sold, on the ground that C. L. Borie and his associates bought as agents.

of the corporation. On the 24th of March 1864 the contract was signed to buy from the purchasers from Lewis. The Tatham property was not included. Some of those buyers, deeming the contract complete, offered to sell their proportion of shares of the stock they were to receive. They had offers to take it at the price named by them. These offers were without representations as to capital or property or cost; all that was stated was that it was a zinc farm, and the price five dollars per share. Neither of the plaintiffs were amongst those offering to buy; those who did offer were afterwards referred to the broker authorized to sell for all the owners jointly; they made their contract with him, paid him the money and received their stock. All these were "the private acts of the individuals who, expecting to complete an inchoate bargain, had in anticipation proposed or agreed to sell the property they would receive if that bargain had been carried out. That bargain was never made, as has been stated. A distinct one was substituted, and under it these purchasers received the stock they had offered to sell, but on very different terms from those anticipated when they proposed selling. They submit that none of them are in any manner liable to the corporation by reason of any such transaction."

Harris, an expecting purchaser, on March 24th, after the contract of that date had been signed, supposing the transaction was settled, told Kuhn there was a zinc stock "we are about buying on the market, and I think money can be made on it. The price is five dollars." There was no statement as to the location or cost of the property. They denied that Evans through Fisher made any contract by which he got any right to stock before March 28th. Fisher applied for one thousand shares of stock to Fox, who, supposing all that had been authorized to be sold had been sold at five dollars, agreed to sell at six dollars. Fisher accepted. Fox learning that the broker had not sold all he had been authorized to sell at five dollars, relieved Fisher from the sale, and referred him to Maitland, their broker, from whom, on the 28th of March, he bought one thousand shares for $5000. The defendants insist that neither the corporation nor the plaintiffs litigating in their name can claim relief under these circumstances.

On the 25th of March, at a meeting of some of the owners, it was ascertained that some had sold their stock. C. L. Borie being dissatisfied with this because it would interfere with the sale of his forty thousand shares, it was agreed that all sales should be by a common broker, and be made pro ratâ; those who had given orders to individual owners were turned over to the broker, and through him all sales were made; it was agreed ten thousand shares, to be contributed pro ratâ, should be sold for working capital; this was done and the proceeds paid to the corporation after its organization. It was also agreed that one hundred thousand shares

should be sold. Borie at that meeting said that as stock could not be issued until after the corporation should be organized, if any were sold and paid for before, a memorandum should be given to the purchasers of the fact, and for that purpose the form of receipt mentioned as having been given to Evans was prepared and the recital that the money was paid by subscription, is untrue if implying that the money was paid on a subscription to a corporation.

Arrangements were then made for procuring a charter; the charter of 1854 being under the control of one of their number, on their application, was extended to Blair county; the corporators, under the Act of 1854, associated whith them those who desired it, and they organized, elected officers, and prepared to issue stock; the purchasers of shares did not then know whether the company would be organized under the general law of 1854, allowing land to be taken as stock or under a special charter. Immediately after Borie made the contract, and before any sales were made, on the 25th of March he called for fifty per cent. of the cash purchase-money, and on the next day $100,000 were paid to him, none of which was from the sale of stock. Kuhn on the 24th deposited with Harris, United States certificates of debt for his stock, but none of his money was used for the purpose; Harris advanced his own money, and Kuhn's securities were not cashed until the 28th; there was no agreement amongst any of the parties to organize a corporation and take the stock as a consideration for the property, less $50,000 to be raised from the ten thousand shares. Even if those who bought from Borie with intent to organize a corporation were compelled to let the corporation have the property at cost, the defendants are required to account to the corporation only for the profit on the transaction, which was $50,000, the proceeds of the ten thousand shares, viz., of the two hundred thousand shares, the capital, one hundred thousand shares were left with a committee of the purchasers, forty thousand shares, realizing $200,000, were paid for the property; and in addition there were paid forty thousand shares by agreement; there were ten thousand shares for working capital; which would leave ten thousand shares as above stated. The one hundred thousand shares left with the committee were not to be put on the market for a year; after that time they were distributed amongst the parties, and there were still held by them under that distribution seventy-two thousand shares.

If it were a mistake to receive money for stock as subscription to capital instead of as the price of stock sold, it was a contract of the seller with each stockholder and not with the corporation representing the aggregate body of the purchasers, and the cause of action would be the difference in value as represented to the purchaser and the actual value.

This answer averred that the Bories, Bell, Maitland, Bowen,

[Evans's Appeal.]

Fox, Bayard, D'Invilliers, Hopkins and Wister, defendants, were creditors of the corporation to the amount of $36,500, with interest.

Any claim on the ground of misrepresentation, that the money paid was for subscription to the capital, could not be pursued by the corporation, not being a right common to all the stockholders, and this would be a matter between the particular person defrauded and the party defrauding. It was still averred that the plaintiffs had no cause of action, as they did not give more for the stock than its market value when they purchased. Up to April 1st stock could not have been bought at a less price than they paid, and up to April 4th it was generally at a premium. The corporators, in the Act of 1854, did not contemplate any connection between their charter and the property mentioned in the bill ; but when the owners of the property contemplated organizing a corporation, they applied to the corporators to enable them to act under it. On March 24th 1864 it was agreed to organize a corporation, and they obtained a charter for that purpose on March 28th. Evans's agent, when he bought the stock, knew he bought it from persons who had undertaken there should be such a company. Kuhn's agent told him it was a stock "we are about bringing out," and on this he ordered the stock. The purchasers of the stock acquiesced in the conduct of the defendants in regard to the transaction by accepting their certificates, and not making complaint until they filed this bill, nearly six years afterwards.

The defendants were holders of a majority of the stock, some of them directors and officers. They did not control the company in respect of suits, &c. Until this bill was filed, no one had asked the officers to sue. This acquiescence was not from ignorance. In 1865, and after the stock had declined, they made a request to examine the facts. A committee of stockholders was appointed, to whom all the facts were stated, explanations made and papers furnished ; every fact now known was then known and made as public as possible. The report of the committee of stockholders was made in July 1865. Several persons brought suits ; one was withdrawn, and the others had been pending for a long time and were never brought to trial.

The answer of the corporation averred that the charter of 1854 was obtained and other persons associated with the corporators for the purposes as stated in the foregoing answer, and that the facts stated in it were true.

If any trust existed it was an implied one, and arose when the owners of the property transferred it and received the stock bargained for. This was completely done as early as April 1864 ; before any proceedings were commenced, more than five years had elapsed, and the right, if any, which the corporation had, was barred by the Act of 1856.

The master found the facts as follows :—

1. The Act of May 9th 1854, which had been obtained by Wister, and was controlled by him.

2. The ownership by Lewis of the Blair county farms, and interest in the leaseholds, in which Tatham also had a half-interest.

3. About March 1st 1864 Wister procured from Lewis an option to purchase his farm for $100,000, with the understanding that Borie and Hopkins should be interested with him, if they desired. They did not agree to participate until the 24th of March, Hopkins having previously inquired of Wister if he had not a charter for a zinc company.

4. Shortly before March 14th Wister employed a geologist to examine the land.  His report was addressed to "C. J. Wister and his associates."  The cost of printing the report was paid by the Keystone Zinc Company.

5. On March 21st Henry Tatham consulted Borie as to getting up a company to purchase the Tatham leaseholds. He informed Tatham he was too late, as his friends had talked of forming such company with the Lewis farm, and that if Tatham was willing to take stock in a company that might be formed, in payment of his leases, something might be made out of it.  On the 25th, Tatham inquired of Borie what the company was to be.  Borie informed him that, if one should be formed, it would be on the basis of $100,000 for the Lewis farm, and the leases at their relative value.  Tatham declined, thinking the Lewis farm not worth that sum.  Borie said if Tathams would give him the refusal of the leases till April 1st, he would try to include them in any arrangement that might be made.  The refusal for $50,000 was given as requested.

6. Wister had been urgent with Borie and Hopkins to purchase the Lewis property and form a company, telling them if they would not, he could find one that would purchase, and that would give them a handsome profit.  Hopkins and Borie hesitated.

7. On March 24th Borie, Wister and Hopkins concluded to purchase the Lewis farm, Borie informing the others that he had the refusal of the Tatham leases for $50,000, which he added ought to be included in the purchase by parties forming the company.

8. It was agreed that Borie should purchase the Tatham leases as well as Lewis's farm for $150,000 for the entire property.

9. It was further agreed that if Wister could find any parties to pay $50,000 profit, he might sell to them; but if not, they would do what they thought best.  Wister stated at this meeting of March 24th, as well as previously, that he owned or controlled a charter under the authority of which such a company could be formed.

10. The paper of March 24th, mentioned in the answer, was

prepared and given to Wister for the purpose of obtaining signatures.

11. While Wister went to secure subscribers to this paper, Borie completed the purchase of the farm. Lewis executed a paper, dated March 24th 1864, viz. :—

"For and in consideration of the sum of fifty dollars, to me this day paid, I hereby agree to sell to Mr. C. L. Borie all my right, title and interest in my farm in Blair county, known as the Waite farm, of one hundred and sixty-one acres, more or less; also a tract adjoining of about twenty-five acres, known as the Galbraith property, for the sum of one hundred thousand dollars, upon the execution of satisfactory deeds, including all mineral rights."

12. Lewis refused to include in this sale his half-interest in the leases; and after much bargaining, Borie agreed to buy this interest for $50,000. Lewis executed this paper :—

"It is also agreed and understood, that for the additional sum of $50,000, I will transfer and set over to the said C. L. Borie, or his assigns, all my right, title and interest, as well as that of Mr. William J. Taylor as far as I can control them, in all or any leases held by me or him severally or jointly with each other."

13. While Borie was concluding the purchase with Lewis, Wister procured to the first paper the signatures of Maitland, Bell, Shaw, Bayard, Fox, D'Invilliers and Harris, all for $20,000 each, except Bayard, who subscribed $10,000. Most of these had, before the paper was presented to them, been informed that a zinc property was for sale, in which they were wanted to take an interest with the view of forming a zinc company in which they were to become the owners of shares.

14. Before Borie left Lewis he asked him if he would like to join with others in buying the property and leases, and take stock of a company pro ratâ for his interest. Lewis agreed to take an interest of $20,000, and Trotter, who was present, on being asked by Borie if he would take an interest, agreed to take $20,000, and both Lewis and Trotter authorized Borie "to act and do for" them. On the same day Borie informed Lewis that he had subscribed $10,000 each for Lewis and Trotter, with which Lewis said he was dissatisfied, and demanded more; he was allotted $10,000 additional in the name of Nathan Bartlett.

15, 16, 17. The facts as to Borie requiring $50,000 additional, in consequence of the purchase of Lewis's leasehold interest; the plan to give forty thousand shares additional to Borie, estimated at $1.25 per share, and Borie's offering the amount of subscription that was needed, were found substantially as set out in the answer.

18. On the same day that this paper was signed, but after it was signed, most of the parties to it offered for sale their stock or shares in the projected company. They were readily sold at five

dollars per share. The parties agreed that Maitland should sell the stock on their joint account.

19, 20. About March 24th 1864, Harris informed Kuhn that he and a number of gentlemen had purchased property in Blair county, containing about one hundred acres, and leased twelve or thirteen hundred acres adjoining, together with the mining privileges; that the land was reported by a geologist to be very rich in zinc ore of an excellent quality; that they intended or were about to organize a company with a capital of two hundred thousand shares. Harris added that, believing this to be a valuable property, he had come to give him a chance of being interested; that they had determined to dispose of sixty thousand shares of the two hundred thousand at $5 a share. Kuhn agreed to purchase six thousand shares; and on the 26th Harris informed him he had purchased that amount for him; and the next day Kuhn paid the purchase-money in the temporary loan of the United States. On the 26th Evans purchased, through his broker, one thousand shares of the stock, and on the 28th paid for them.

21. The defendants Maitland, Bayard, Harris, Bell, Bowen, Fox and D'Invilliers are stock-brokers, and were actively engaged in soliciting purchasers for and selling the stock on March 24th and subsequently.

22. On the 25th March, Fox informed Borie that he had sold his stock at $5 a share. Borie said to him that. that was all wrong, that the company had not been organized, and that there was no stock, and that when Fox sold his stock he wanted his own and that of his friends sold. Borie insisted that the parties should meet that afternoon, to determine upon their organization, &c.

23. On the afternoon of the 25th March, Maitland, Bell, Shaw, Fox, Harris, D'Invilliers and Bayard met at Borie's office. Borie stated the manner in which he had changed the original terms of the purchase, namely, that he and his partners, Wister and Hopkins, were to receive stock instead of cash. They all assented to this change, and they agreed to organize on the basis of a charter owned or controlled by Wister, with a capital of $1,000,000, divided into two hundred thousand shares at $5 each; and it was agreed that $50,000 should form the working capital of the company, when it was organized.

24. At this meeting Maitland and Bell informed Borie that they had sold all or nearly all of their stock. He claimed that all the parties in interest should have a proportionate interest in the sales, and that all their stock should be sold for joint account, that a committee should be appointed for that purpose, and that all stock sold should be put into their hands, each party furnishing a pro ratâ portion. This was agreed to, and it was resolved to place sixty thousand shares in their hands for sale; that number being fixed because that number had been already sold.

25. Borie advised that a printed form of receipt should be prepared and given to each purchaser,—that mentioned in the bill as having been given to Evans.

26. Next day, sales of nearly one hundred thousand shares having been reported, the same parties again met and increased the number of shares to be offered for sale to one hundred thousand; and further, that the balance of unsold stock should be locked up in the hands of the committee, not to be sold for one year without the consent of three-fourths of the party in writing.

27. Meantime Wister, with the knowledge of Borie and Hopkins, procured the passage of the Act of March 28th 1864.

28. On the same 25th March, Borie notified the parties who had agreed to purchase to pay him fifty per cent. of the purchase-money as security that they would carry out their agreement to purchase. Harris & Co., on the 25th of March, paid $10,000 on account of their share of the purchase, Bayard $5000, Bell $10,000 and Trotter $5000; and on the same day Borie lent to Harris & Co. $10,000, to Bayard $5000, and Bell $10,000. On the 26th March, Bowen & Fox paid to Borie $10,000, D'Invilliers $10,000, Maitland $10,000, Shaw $10,000, Lewis $5000, Bartlett $5000, A. E. Borie $5000, Hopkins $3750, Wister $3750, C. L. Borie $3750 and H. P. Borie $3750; and on the same day Borie lent to D'Invilliers $10,000, Lewis $10,000, H. E. Borie $5000, Hopkins $3750, Wister $3750, C. L. Borie $3750 and H. P. Borie $3750. The apparent payments to Borie by Harris & Co., Bayard, Bell, D'Invilliers, Lewis, Bartlett, A. E. Borie, Hopkins, Wister, C. L. Borie, H. P. Borie, were not actual payments, but were of sums of like amount lent to them at the time of payment by H. & C. Borie.

29. At the meeting on the 25th March, Borie was appointed treasurer, " to receive and deliver the stock" to Maitland, and receive from him the proceeds. Maitland sold one hundred thousand shares of stock, and paid to Borie on March 29th $200,000, and on the 9th April $250,000. He retained in his hands $50,000 by the agreement of the parties, to be used by him, under the instructions of their committee, in the purchase of such of the stock as they might judge expedient. Borie held the $200,000 for payment for the property when the proper conveyances should be executed; and on April 5th he paid Lewis $150,000 and Tatham $50,000.

30. The sum of $250,000 paid to Borie on April 9th was divided among the parties, according to their respective interests. That is to say, there was paid to E. T. Shaw $12,000, Harris & Co. $12,000, Maitland & Co. $12,000, John P. Bell & Co. $12,000, C. D'Invilliers $12,000, Bowen & Fox $12,000, C. P. Bayard $6000, George Trotter $6000, George T. Lewis $6000, N. Bartlett $6000, A. E. Borie $6000, E. M. Hopkins $31,166.66, C. Wister $31,166.66, C. L. Borie $4500, H. P. Borie $4500, C. &

H. Borie $26,666.86; the Keystone Zinc Co. $50,000, to pay for the subscriptions by C. & H. Borie, E. T. Shaw, E. V. Maitland, John P. Bell, Bowen & Fox, C. P. Bayard, C. D'Invilliers, Harris & Co. and Charles Wister, each for one thousand shares, except Wister, who subscribed for two thousand. These payments were made April 9th 1864.

31. At a meeting of the corporators of the Keystone Zinc Company held April 6th, the act of incorporation and the supplement were accepted. Books were opened for subscriptions for the capital stock, when C. & H. Borie, E. T. Shaw, E. V. Maitland, John Bell, Bowen & Fox, C. P. Bayard, C. D'Invilliers and Harris & Co., each subscribed for one thousand shares, and Charles Wister for two thousand. The subscription price for these shares, namely, $50,000, was paid by Mr. Borie, as mentioned.

32. These stockholders met on April 7th, and resolved that the original stock of the company "be divided into one hundred thousand shares, at $5 per share." They elected a president and directors, all of whom were among the purchasers of the land. At an adjourned meeting next day it was resolved to increase the capital stock to two hundred thousand shares; and that the directors be directed to purchase for the purposes contemplated in the charter the real estate sold by Lewis and Tatham; to pay for the same the sum of $200,000, with one hundred and ninety thousand shares of the capital stock, which shares the directors were authorized to transfer to the vendors of the land.

33. The directors met the same day, and authorized the president of the company "to effect the said purchase on the terms proposed, and to transfer the said stock," &c. At a meeting of the board on April 23d, the president reported "that he had executed the necessary deeds, &c., for the purchase."

34. On April 8th there were issued the certificates of stock to the subscribers for the fifty thousand shares, as mentioned in 31st paragraph. At the same time there were issued to C. & H. Borie two certificates, one for one hundred thousand shares and one for ninety thousand, in payment for the land and leases.

35. The shares so delivered to C. & H. Borie were thus disposed of: 100,000 to E. V. Maitland, 7000 to Harris & Co., 7500 to E. V. Maitland, 7000 to John P. Bell, 8500 to C. D'Invilliers, 7000 to Bowen & Fox, 3000 to C. P. Bayard, 9667 to E. M. Hopkins, 40,333 to C. & H. Borie. The delivery of this stock to C. & H. Borie was in fact in trust for the parties who had subscribed and paid for stock or shares before the organization of the company, and also for C. Borie's co-purchasers' shares, in part of their profit on the resale to the corporation.

36. Of the money received by Maitland, after he had paid Borie $450,000, he retained $50,000 for the purpose of speculating in the stock, at the discretion of the trustees named for the purpose

at the meeting of the 25th of March. The profits on the speculation, when the account was closed, were paid to the parties, namely, to Shaw, Bell and Bowen & Fox $1284.00 each, D'Invilliers and Harris $1027.20 each, C. & H. Borie $6163.20, Bayard $513.60, Maitland $1027.20.

37. The parties who signed the agreement of March 24th received $250,000, the balance of the $500,000 received by Maitland after paying for the property and retaining $50,000 for the purpose of speculation; and $13,610.40, the profits from the speculations with the $50,000; and ninety thousand shares of stock; on all this they did not pay a dollar.

38, 39. The actual subscribers or purchasers received their certificates of stock from or through Mr. Maitland, out of the one hundred thousand shares assigned and transferred to him for that purpose; they were not informed of the meeting at which the company was organized, nor were they present at it nor at that at which it was determined to buy the property from Borie.

40. The parties who purchased the stock or shares were never precisely informed what they bought. They never inquired. If they had, inquiry would, probably, never have ended in knowledge, for the sellers were as ignorant as the purchasers; some of them have testified that they did not know themselves. Both believed they were buying and selling into a speculation, and that sufficed to satisfy them.

41. Mr. Kuhn, in the fall or winter of 1864–5, inquired of Harris why a meeting of the stockholders was not called, in order that the parties interested might ascertain what was doing, and the reply he received was that there was nothing to tell. On the 3d October 1865, however, there was a meeting of stockholders, which Mr. Kuhn attended; he testified that a report from a committee which had been appointed to investigate the affairs of the company was read, "of such a damaging character to the concern and those having the management of it, that I at once determined to take legal measures for the recovery of my money, which I considered had been improperly made use of." Mr. Kuhn "very shortly after" called on counsel and informed him of his determination and retained him to commence suit. His counsel informed him that a suit had been instituted by other parties, that their case was similar to his, and that a decision in that would determine his, and advised delay until the termination of the existing case. In this advice Mr. Kuhn acquiesced. Mr. Kuhn's counsel testified that he did not bring suit "because he had no instructions to do so," and because he believed his recommendation to him that he should await the issue of pending suits seemed to have his acquiescence.

42. An Act of the General Assembly, approved March 21st 1865, authorized the corporation to borrow not exceeding $200,000,

to issue bonds therefor, and secure their payment by a mortgage of their estate and franchises ; and at a meeting of the stockholders, held October 17th 1865, it was determined to submit the question of the acceptance or rejection of this supplement to a stock vote. As the result of this vote the supplement was accepted. Mr. Kuhn and Mr. Evans voted in the negative. Mr. Wells and Mr. Kenney did not vote.

43. The minutes of the corporation under the date of May 19th 1871, contain the following entry : "Joseph Maitland, Esq., president, reported verbally that the works had not been in operation during the past year, and therefore had nothing to communicate relative to the details of the works further than may be found in the treasurer's accounts herewith submitted. He further reported that a judgment had been obtained against the company at the suit of parties who had loaned the money necessary for the building of the works, and that the leases and personal property had been levied upon and sold on the 19th of January last under that judgment. He further stated, that having exhausted all the personal property, they had now levied upon the real estate, and it would be sold for the balance of their judgment between this time and July or August next."

44. Mr. Charles Borie being asked, on his examination, what was the present condition of the property? replied, "It has all been sold ; farm, personal property and leases ; all the property of the company, on judgments obtained by creditors." These creditors were parties who had loaned money to the corporation, namely, E. T. Shaw, George Trotter, C. P. Bayard, Bowen & Fox, E. H. Hopkins, C. & H. Borie, C. D'Invilliers, E. V. Maitland, George T. Lewis, Charles Wister, A. E. Borie and John P. Bell. Their claims amounted in the aggregate to $34,000. Mr. Borie also testified that the property was bought in for the creditors.

45. The sheriff's deed is made to Frank W. Paul, Esq., who has executed a declaration of trust, reciting that the purchase-money recited in the sheriff's deed to have been paid, was paid by Charles L. Borie, and declaring that he held the property in trust for him, to be conveyed as he shall direct.

46. There is no evidence showing the cause of the company's insolvency.

The report of the master proceeded :—

"Densmore Oil Company v. Densmore, 14 P. F. Smith 43, decides that there are two principles applicable to all partnerships or associations for a common purpose of trade or business.

"1. That any man or number of men, owners of property, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent misrepresentation made by the vendors

to their associates. The latter are in no better position than strangers. They must exercise their own judgment as to the value of what they buy.

"2. That where persons form such an association, or begin or start the project of one, from that time they do stand in a confidential relation with each other, and to all others who may subsequently become members or subscribers, and it is not competent for any of them to purchase property for the purposes of such a company and then sell it at an advance without a full disclosure of the facts. They must account to the company for the profit, because it is legitimately theirs.

"Within which of these two propositions does the conduct of the defendants fall?"

After giving a synopsis of the facts, he proceeded:—

"Whatever may have been Mr. Borie's position when he agreed to buy from Lewis, yet after he bought and associated with the other subscribers to the paper of March 24th, he and those he represented united with them in beginning or starting the project of an association; and one of the professed objects of the parties was to sell the property to the projected company at an advance on the price at which they purchased it.

"This is the very case of McIlhenny's Appeal, 11 P. F. Smith 188. There it appeared that McIlhenny was the owner of certain land supposed to contain oil. He offered it for sale to parties at the sum it cost him, namely, $12,000, and a share of the profits to be made by the purchasers from him, in case they put it into a company at the sum of $40,000. He sold to an association on these terms. After the contract with and sale to his vendees, he associated with them as purchasers at $40,000, on which to form a company. 'Thus,' say the court, 'they became buyers and sellers to and for the company. The rule seems to be settled in numerous cases, that the promoters of such companies, when they buy to form a company, and their purchases are taken by the company, they cannot make profits on these sales.'

"In this case the court decreed that McIlhenny's estate should pay a sum equal to the profits received by him from the company in the sale to it by the promotors.

"The actual formation of the company by the defendants is thus shown by the testimony."

The master then stated the testimony as before given, and proceeded:—

* * * "Mr. Borie in his answer says, and it is also shown by the testimony, that he stipulated for a profit of $50,000 for himself, Hopkins and Wister, on the resale of the land, and that this was afterwards so changed, that in lieu he agreed to receive forty thousand shares in the projected company, which, at the price of $1.25 per share, would equal his stipulated profit. But the evi-

dence shows that Borie, Hopkins and Wister received in money, as their share of profits, more than $93,000, besides over fifty thousand shares of stock. The receipt given to the subscribers to the stock was, on its face, a declaration that they were subscribers to the stock of a company, and that their money was to go into the treasury of the company. The sale and purchase by the directors of the company by and from themselves for the company, at a price beyond which they paid, is beyond all question ' a transaction so incorrect that it is quite impossible that any court of justice could permit it to stand.'

" The master has no difficulty in arriving at the conclusion that, under the authorities, the defendants would, in a proper suit, if brought within a proper period, be liable to account for the profits they have made.

" The bill filed is substantially a corporation bill. This was asserted by the defendants and conceded by the plaintiffs. The latter in their bill aver that the defendants own or control the defendants' corporation ; that some of them are directors or officers, and in that way manage and direct the company, and neglect and refuse to take any measures, or permit the company to take any, against themselves for obtaining the relief which the plaintiffs seek.

" The corporation, in its answer, denies the equity of the bill, and asserts that the matters set forth in its answer are sufficient to justify the refusal to institute any such suit as the plaintiffs require. * * * "As it is an axiom that a court of equity jurisdiction ' will relieve against every species of fraud,' the master reports that if the individual defendants shall be finally found liable, the decree should be that they pay the amount of their profits to the corporation.

" But an important question yet remains to be considered, and that is whether the plaintiffs, by their laches, have not deprived themselves of all claim to relief ?

" ' It is a principle in equity,' says Lord Selborne, in Ayerst v. Jenkins, Law Rep. 16 Eq. 275, ' that long delay in seeking to rescind a transaction originally voidable, on the faith of which other parties have irrevocably made their arrangements in life, may operate as a bar to relief.'

" In the winter of 1864–5, Mr. Kuhn, being informed that something was wrong in the organization or management of the company, urged one of the directors (Harris) to cause a meeting of the stockholders to be called, that they might have an opportunity of inquiring into its affairs. At such a meeting, in 1865, he learned that which was, he says, ' of such a damaging character to the concern and those having the management of it, that he at once determined to take legal measures for the recovery of his property,' which he considered had been improperly used. He

called on counsel to commence suit, and the delay which occurred was in consequence of his advice. The reason given for such advice was ' that there had been a suit commenced by other parties; that (his) case was .similar to theirs; that as their suit terminated favorably or unfavorably, so would (mine), and that there was no use for (me) to bring suit, as a decision in that case would determine my own.' The testimony of Mr. Kuhn's counsel is, that he did not proceed because he had no instructions to do so, and because he believed that his ' recommendation to Mr. Kuhn that he should await the issue of the suit mentioned had his acquiescence.' The suits referred to were actions on the case.

" There has been no evidence on the subject of the delay in proceeding on behalf of Evans, Wells and Kenney, the other plaintiffs.

" The bill in this case was filed March 19th 1870, five years and over from the time Mr. Kuhn determined to take legal measures to recover his money.

" Laches and neglect are always discountenanced. Nothing can call a court of equity into activity but conscience, good faith and reasonable diligence. That court cannot define the time of bar by a positive rule; it must be governed by circumstances. It refuses relief to stale demands, even in cases where no statutable limitation exists.

" The question of what length of time will bar the assertion of a constructive trust, was considered in 'Ashhurst's Appeal, 10 P. F. Smith 290. In this case it was said by the judge at Nisi Prius, ' But what is the reasonable time within which a constructive trust must be asserted ? The cases do not clearly define it, and perhaps it is incapable of strict definition. It must vary with the circumstances of each case. For myself, I think it may be safely laid down, that where a party claims to hold another a trustee of personal property under a constructive trust, that he must assert the claim within six years from the time when the trust is alleged to have originated; in analogy to the Statute of Limitations he cannot be permitted to make the assertion afterwards. This, I think, should be regarded as the general rule. There may be cases where even six years cannot be allowed, as when a party, having a right to set aside a transaction or treat it as a trust, stands by and sees another dealing with the property in a manner inconsistent with any trust, and makes no objection. And so when the rights of third persons may have intervened. So, also, where the property is of a peculiar kind, and the alleged trustee, in ignorance of any intention to hold him to an account, relying on his ownership, enters upon a hazardous business or incurs large responsibilities. At least this is true when the alleged constructive trust does not grow out of actual or intended fraud. It has often been said that equity obeys the Statute of Limitations, and it has

been held that laches for a much shorter period than six years, aided by other circumstances, will bar a right.'

" These principles were applied to that case, and the plaintiff was held to be barred because his bill was not filed until seven years and four months after his right to sue, if any he had, came into existence. This decree of the judge at Nisi Prius was affirmed by the court in banc, the opinion declaring that the court were unable to discover error in any of the conclusions arrived at by the judge below. This case, therefore, must be taken to have decided that laches for a shorter period than six years, aided by other circumstances, will bar a right in equity.

" The meeting of the stockholders at which Mr. Kuhn learned that which determined him to bring suit to recover the money which he had paid for stock, was held October 3d 1865. At a meeting held October 17th, in the same year, he and Mr. Evans were present and participating in the proceedings by voting their stock against the acceptance of an amendment to the charter of the company, which authorized it to borrow money, issue bonds, and secure them by a mortgage of the estate and franchises of the corporation. At this meeting a resolution was offered authorizing the directors to borrow on the security of such a mortgage. The amendment to the charter and the resolution were both adopted by the vote of a majority of the stockholders, who also held a majority of the stock.

" This conduct of these two parties was inconsistent with any intent to proceed against the defendants, who were the directors of the corporation, in such a manner as would disorganize and cripple the company in whose prosperity they had so large an interest.

" The managers of the company seem to have fairly and honestly endeavored to manage its affairs for the advantage of the stockholders. They borrowed money, themselves being the lenders, not, however, under the authority of the amendment for the purpose of constructing works, &c. And all this was done without interference or objection by any of the plaintiffs. The application to counsel made by Mr. Kuhn was not known, so far as appears, to the defendants.

" The master reports that the bill should be dismissed, each party to pay his own costs."

Exceptions were filed with the master by both parties. The 5th of the plaintiffs' was :—

" The master errs in reporting generally, that the bill should be dismissed, whereas the reasons he gives for such dismissal only apply to two of the complainants."

As to this exception the master reported :—

" I omitted to report why I considered that the bill as to Wells and Kenney should be dismissed. These parties knew of the

matters complained of as entitling them to relief in 1865, and they did not become parties to the bill until 1872. They were therefore outside of the statutory time of six years. They could not at the latter period have filed a bill originally.

"It has been argued with earnestness that they are to be considered as being parties to the bill at the time it was filed in 1870. And for this authorities have been cited. These are to the effect that a bill filed by a creditor on behalf of himself and others will prevent the running of the statute as to those not named, and that a creditor who comes in during the progress of a suit which has been instituted by one creditor on behalf of himself and others, is to be considered in the light of a plaintiff, as if the bill had been filed in his name : Sterndale *v.* Hankinson, 1 Simons 393; O'Kelly *v.* Bodkin, 2 Irish Eq. 369. But these cases were cases of creditors' bills—proceedings not known in Pennsylvania. The claims were claims *ex contractu.* No similar decision has been shown in a case where the bill was filed on behalf of *cestuis que trust* claiming under a constructive trust. I am, therefore, unable to conclude otherwise than that Wells and Kenney are to be considered parties only when they came in by their petition in 1872."

With some unimportant alterations, the master overruled all the exceptions.

At Nisi Prius December 22d 1874, the exceptions to the master's report were overruled, and it was decreed that the bill be dismissed, each party to pay their own costs.

Evans and Kuhn appealed to the court in banc.

They assigned for error,

2. Dismissing the complainants' bill.

4. Not sustaining complainants' second exception, viz. : "Reporting that the presence of Messrs. Kuhn and Evans, two of the plaintiffs, at the meeting of October 17th 1865, and their voting against the acceptance of the amendment to the charter authorizing it to borrow money, issue bonds, and secure them by mortgage of the estate and franchises of the corporation, was conduct inconsistent with any intent to proceed against the defendants, who were the directors of the company, in whose prosperity they had so large an interest, and therefore reporting that the bill should be dismissed."

5. Not sustaining complainants' third exception, viz. : "Reporting, when he had already in effect reported that these very directors, at the time of that meeting, had in their hands large sums of money applicable to the very purpose for which at that meeting it was resolved to raise money by mortgaging the company's property, and which sums were fraudulently withheld from it by them, and the presence and votes of said plaintiffs at that meeting were exactly in the line of and in accordance with their present suit, the object of which is to put into the treasury of the

company funds to pay its debts and continue the developments of its mineral property; that is, their votes were to prevent the raising of money by mortgage, when the defendants owed the company more than was needed."

6. Not sustaining complainants' fourth exception, viz.: "In so reporting, because instead of an intent to proceed against the defendants as directors of the company in a manner to disorganize and cripple it, the suit intended and now brought was and is a suit to put the company in a prosperous condition, by bringing into its treasury from the pockets of the individual defendants large sums which properly belonged to it."

7. Not sustaining complainants' fifth exception, viz.: "Reporting generally that the bill should be dismissed, whereas the reasons he gives for such dismissal only apply to two of the complainants."

8. Not sustaining the plaintiffs' sixth exception, viz.: "Reporting that the managers of the company seem to have fairly and honestly endeavored to manage its affairs for the advantage of the stockholders, after in effect reporting that they were all the time fraudulently withholding from the company many thousands of dollars to which it was entitled, and, while so withholding said moneys, had sued the company for alleged loans, had its property sold by the sheriff, and had bought it in for themselves."

9. Not sustaining the complainants' seventh exception, viz.: "Reporting that the sums which defendants allege they lent to the company were really sums borrowed by the company from them individually, when he had before in effect reported that they owed to the company much more than they allege that they lent, and a court of equity would, under the circumstances, treat such alleged loans as payments on account of what they owed."

10. Not sustaining the complainants' eighth exception, viz.: "Reporting that this borrowing and lending was done without any interference or objection by any of the plaintiffs, when there was no evidence of any knowledge whatever of said borrowing or lending on the part of the plaintiffs."

11. Not sustaining the complainants' ninth exception, viz.: "Reporting that the bill should be dismissed because of the complainants' delay for a period of nearly six years, aided by other circumstances, whereas he should have reported that no circumstance existed to take the complainants' case out of the general rule, and that, therefore, as the bill was filed within six years, the complainants were not barred by this delay."

*G. T. Bispham* and *E. S. Miller*, for appellants.—The time which equity fixes as a bar to proceedings to enforce personal rights is six years, in analogy to the Statute of Limitations: Ashhurst's Appeal, 10 P. F. Smith 290. Here the time after the

[Evans's Appeal.]

discovery of the fraud is about four years and a half. The acts which might estop a plaintiff by his delay in a shorter time, do not apply when the defendant is charged as trustee *ex maleficio*: Bank *v.* Tyrrell, 27 Beav. 29. To make an equitable estoppel, there must be some wilful, intentional or careless misleading: Commonwealth *v.* Moltz, 10 Barr 527; Hill *v.* Epley, 7 Casey 334. Where the right is vested in a large body of persons, acquiescence is not a ground for refusing relief: Hill on Trustees 170; Perry on Trusts 867; Whichcote *v.* Lawrence, 3 Vesey 746; Parkston *v.* Brewster, 14 Ala. 320; Matthews's Presumptive Ev. 452; Cumberland Coal Co. *v.* Sherman, 30 Barb. 574; Lewin on Trusts 473; Davidson *v.* Tullock, 3 Macq. 783; York Building Co. *v.* Mackenzie, 8 Bro. P. C. 42; Hardwick *v.* Mynd, 1 Anstr. 109; Kidney *v.* Coussmaker, 12 Vesey 158. When one creditor within six years files a bill for all, the statute will not run against any of them, but others may come in after the time had run as to them: O'Kelly *v.* Bodkin, 2 Ired. Eq. 361; Sterndale *v.* Hankinson, 1 Sim. 393; Bennett *v.* Bernard, 12 Ired. Eq. 233; Carroll *v.* Darcy, 10 Id. 321; Foster *v.* Mackenzie, 17 Beav. 414; Archbold *v.* Scully, 9 H. of L. 360; Clench *v.* The Financial Corp., Law Rep. 4 Ch. App. 123; Stanhope's Case, 1 Id. 161; Spering's Appeal, 21 P. F. Smith 11.

*R. C. McMurtrie* and *G. W. Biddle* (with whom was *J. W. Paul*), for appellees.—If an agent sells his property to his principal, concealing his ownership, the principal cannot require the agent to let him have it at what it cost him; all he can require is the rescission of the contract: Driscoll *v.* Bromley, 1 Jurist 238; Great Luxemburg Railroad Co. *v.* Magnay, 25 Beav. 586. The fiduciary relation on the ground of agency arises by inducing others to believe that they had been engaged in common project for purchasing land to organize a company: Densmore *v.* Densmore, 14 P. F. Smith 50.

A suit cannot be maintained by some of a class, except when all are in the same circumstances: Mocatta *v.* Ingelby, 5 L. J. N. S. Ch. 145; Mitford 39.

Mr. Justice MERCUR delivered the opinion of the court, May 8th 1876.

This is substantially a corporation bill. It was filed by Evans and Kuhn, who are stockholders in the Keystone Zinc Company. Some two and a half years thereafter the bill was amended by adding two other stockholders as complainants.

The ground of complaint is, that in the formation of the company both the defendants and the plaintiffs were associated together; that the defendants purchased certain mineral lands, and sold them to the corporation of which they were directors, for a

sum many times greater than they actually paid for them; that the price they paid was concealed from the plaintiffs, whereby a resulting trust has arisen, and the defendants are liable to account for the profits which they have made.

The master found the evidence sufficient to establish a constructive trust, but reported that the bill be dismissed by reason of the laches of the plaintiffs in filing it. The court confirmed the report and dismissed the bill.

We will therefore consider the sufficiency of the laches and attending circumstances, to justify the decree of the court.

In March 1864, the agreement for the formation of the company was made, and the defendants entered into a contract for the purchase of the land. The necessary act of incorporation was procured in a few days thereafter. Early in the next month, the defendants obtained a conveyance of the land, and sold it to the corporation, of which they were three directors, and certificates of stock were issued thereon, in pursuance of a resolution of the stockholders. At a meeting of the stockholders, early in 1865, Kuhn swears that he obtained information "of such a damaging character to the overseer and those having the management of it, that I at once determined to take legal measures for the recovery of my money, which I considered had been improperly made use of." With that view he consulted counsel, but in consequence of other persons occupying a similar position, having brought actions on the case, which were then pending, he postponed instituting any proceedings. At another meeting of the stockholders, held in October of the same year, Kuhn and Evans were both present and participated in the proceedings. They voted their stock on the question of the acceptance of an amendment to the charter, authorizing the company to borrow money, issue bonds and secure the same by a mortgage on the estate and franchises of the corporation. It is true they voted against accepting the amendment; but that fact in no wise changes the legal effect of their action for the purposes we are now considering it. The amendment was adopted by a vote of the majority of the stockholders, representing a majority of the stock. At the same time a resolution was also passed authorizing the directors to borrow money on the security of the mortgage.

This bill was not filed until nearly four and a half years after that meeting. If the case rested on the lapse of time alone, that would be insufficient to bar the plaintiffs' rights to file the bill.

As a general rule, a constructive trust in regard to personal rights or personal property may be asserted at any time within six years after a knowledge of the facts creating it. At the expiration of that time it is barred by analogy to the time fixed by the Statute of Limitations: Ashhurst's Appeal, 10 P. F. Smith

290. But laches for a much shorter time than six years, aided by other circumstances, will bar the right: Id.

There is another aspect of this case. The relief prayed for is not that the defendants shall pay anything directly to the plaintiffs, but that they shall pay into the treasury of the corporation, whereby the plaintiffs may be benefited by the increased property of the company. The attempt is to obtain relief through the equitable rights of the corporation. Then the knowledge and conduct of the latter must be considered.

The bill is not to repudiate so much as it is to enforce a constructive or implied contract. The land was conveyed to the corporation 8th of April 1863. Nearly six years thereafter the bill was filed. The minutes of the corporation of the same month of April show the facts on which the present complaint mainly rests. The manner in which the certificates of stock were issued, and payment for the lands made, were sufficient to make inquiry a duty of all who were unsatisfied. No steps were taken to establish a resulting trust.

In October following the company accepted the amendment to its charter and authorized a loan, predicated thereon, to be made. The plaintiffs had full knowledge of this action, both present and prospective. They instituted no proceedings to prevent it. They acquiesced in it. They thereby encouraged the directors to borrow money in pursuance of the resolution of the stockholders. They thereby induced the defendants to believe that no legal proceedings would be instituted predicated of the original purchase of the land. Afterwards the defendants lent money to the corporation, but not under the authority of the amendment. The master has found that the directors "seem to have fairly and honestly endeavored to manage its affairs for the advantage of the stockholders." Nevertheless the company became embarrassed. Judgments were recovered against it by creditors. All its property, both real and personal, was sold and bought in for the benefit of the creditors. Hence, since the plaintiffs had full knowledge, new business arrangements have been made and other rights have intervened. These proceedings were delayed, under the attending circumstances, an unreasonable time. Having been so delayed, the laches is fatal to the plaintiffs' bill. This view is fully sustained by Ashhurst's Appeal, *supra*, and the numerous authorities there cited. Although the transaction was originally voidable, yet having been acquiesced in by the parties who might have avoided it, for a length of time less than six years, but by their conduct having induced the offending parties to believe it was not to be questioned, they are now debarred from avoiding it.

The two other stockholders, who became plaintiffs by amendment, are in a worse condition than the original plaintiffs. Their first action was more than six years after they had full knowledge.

This is not a creditor's bill, in which a creditor has come in during the progress of a suit which one creditor has instituted in behalf of himself and others.    We are now dealing with a constructive trust.    These latter plaintiffs are to be considered as such, with like effect only as if they had filed an original bill at the time they applied by petition to be added to the record as complainants.

       Decree affirmed and appeal dismissed at the costs of the appellants.